739 So.2d 246 (1999)
Penny A. GRYDER, Plaintiff-appellee,
v.
Alvin V. JACKSON, Diamond Enterprises and Canal Indemnity Insurance Co., Defendants-appellants.
No. 32,037-CA.
Court of Appeal of Louisiana, Second Circuit.
June 16, 1999.
Rehearing Denied August 12, 1999.
*247 Stamey Law Firm by Joseph B. Stamey, Natchitoches, Counsel for Appellant.
Johnson & Placke by Allan L. Placke, West Monroe, Counsel for Appellee.
Before GASKINS, CARAWAY, AND DREW, JJ.
CARAWAY, J.
In this case, the driver of the lead vehicle traveling on a highway in an area where passing was appropriate turned left and collided with an 18-wheeler which was attempting to pass. While we affirm the finding of negligence on the part of both drivers, we amend the trial court's allocation between the parties of comparative fault.

Facts
On August 10, 1994, at approximately 6:30 a.m., an automobile accident occurred between appellee/plaintiff, Penny Gryder, and appellant/defendant, Alvin V. Jackson,[1] on Louisiana Highway 34 near Fuller's Convenience Store in Ouachita Parish, Louisiana. Gryder was traveling north on *248 Louisiana Highway 34 on her way to work. The speed limit for the highway was 55 miles per hour and the highway at the place of the accident was straight and level with no obstructions to the vision of a motorist for passing.
As Gryder approached the convenience store on her left, she testified that she activated her turn signal for a left turn. As she made her turn angling her small pickup almost entirely over into the southbound lane, her turning maneuver had not yet brought her perpendicular to the highway when her vehicle was struck on the edge of the roadway by a 40-ton chip truck driven by Jackson. Gryder testified that she had seen the chip truck at some point earlier in time in her mirror, but thought that it was a considerable distance behind her. She also testified that as she began the turning maneuver, she looked in her rearview mirror and did not see the 18-wheeler truck in the passing lane or elsewhere.
Jackson testified that he was driving on the highway at the speed limit of 55 mph and that Gryder never activated her turn signal. However, he did acknowledge that he noticed Gryder begin to slow down as she approached the driveway to the store, but stated that he didn't know she was going to turn left. He further testified that once he realized that Gryder was going to turn he applied his brakes and tried to move onto the southbound shoulder, however, he was unable to avoid the collision. He did not sound his horn prior to the collision.
Impact of the vehicles was front wheel to front wheel as they angled together. Since Gryder's truck had not yet completed a perpendicular turn off the highway, the angles of movement of the vehicles still northward at the time of collision no doubt prevented serious injury to Gryder.
An investigation was conducted at the scene by State Trooper Julie Lewis. Trooper Lewis reported finding 173 feet of the 18-wheeler's skid marks in the passing lane prior to the driveway of the convenience store. As a result of the investigation, Trooper Lewis determined that the cause of the accident was Gryder's failure to pay proper attention when she made her left turn. Trooper Lewis also stated that Jackson's speed did not play a role in the accident.
Approximately one month after the collision, Jamie Wages contacted Trooper Lewis to advise her that he had witnessed the accident while driving immediately behind Jackson's 18-wheeler. Wages told her that when the tractor-trailer entered the left lane to pass the Gryder vehicle it was going approximately 70 mph. Wages further stated that Gryder did activate her turn signal.
After reviewing the testimony, the trial court found that Jackson was traveling at a high rate of speed and gave no regard for vehicles ahead of him. The trial court also found that Jackson observed Gryder's vehicle slowing down and that he should have been put on notice that she might make a left turn. The trial court specifically found that the accident was caused by Jackson and assigned him 90% of the fault. Gryder was also assessed 10% of the fault for her failure to look in her rearview mirror to see if the way was clear immediately before she turned. The damages were fixed in the amount of $19,869.84 subject to a 10% reduction for Gryder's portion of the fault. From this judgment, defendants now appeal the trial court's assignment of fault for this accident.

Discussion
The statutory provision regarding the duties of a left-turning motorist such as Gryder is La. R.S. 32:104(A), which provides:
(A) No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in R.S. 32:101, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a *249 roadway unless and until such movement can be made with reasonable safety.
Judicial interpretations of LSA-R.S. 32:104(A) have made it clear that a left-turning motorist has a strong duty of care. The duty includes properly signaling an intention to turn left and keeping a proper lookout for both oncoming and overtaking traffic in order to ascertain that the left turn can be made with reasonable safety. Agency Rent-A-Car, Inc. v. Hamm, 401 So.2d 1259 (La.App. 1st Cir. 1981). The left-turning motorist is required not only to look to the left before turning, but has a duty to see what should be observable. Hollier v. Gilder, 306 So.2d 475 (La.App. 3d Cir.1975). If the driver of a left-turning vehicle signals a left-hand turn, the left-turning driver only fulfills one-half of the requirement for making such maneuver for it remains incumbent upon him to look to his rear to see if the left-hand lane is clear before beginning his left turn. Kilpatrick v. Alliance Casualty and Reinsurance Co., 95-17 (La.App. 3d Cir.7/5/95), 663 So.2d 62.
In this instance, there was ample evidence to support the trial court's finding that Gryder failed to use her rearview mirror to view the overtaking 18-wheeler. She simply did not see what she should have seen in a high speed area of a highway where a passing maneuver by an overtaking vehicle was appropriate. The testimony of Trooper Lewis, Jackson and Wages was consistent on one significant point. The fully loaded 18-wheeler had moved completely into the passing lane and even over upon the shoulder for a considerable length of time before the impact occurred. Jackson described his passing maneuver as beginning at a speed of 50 to 55 mph which allowed him to downshift to eighth gear as he pulled into the passing lane. Wages confirmed that the 18-wheeler was fully in the passing lane for at least five seconds, and Trooper Lewis summarized the passing action as follows:
"The 18-wheeler was completely within the passing lane. It would be very difficult for an 18-wheeler, because of its size, to make a sudden turn and to have 173 feet of skid marks to do so. It was not a sudden action of the tractor-trailer's part."
The trial court was therefore correct in concluding that Gryder "did not look" for vehicles behind her "just before commencing the turn."
The trial court's emphasis on the excessive, 70 mph speed of Jackson, however, is not supported by the evidence. The trial court based this conclusion on Wages' testimony that he had been following behind the 18-wheeler at 70 mph for many miles and that that excessive speed was still occurring as Jackson pulled out to pass Gryder. Immediately prior to Jackson's passing action, Wages described the three vehicles as traveling in tandem with 20 to 30 feet between the Gryder and Jackson vehicles and another 15 feet between Jackson and Wages. All traveling at 70 mph? This testimony is totally contradicted by the testimony of Gryder and Jackson. Gryder testified that her truck had entered Highway 34 from another rural road a relatively short distance south of the convenience store and that as she then proceeded along Highway 34 to the store, she never obtained a speed in excess of 50 mph. Jackson confirmed Gryder's entry upon Highway 34 from the side road and stated that because of her unyielding entry, he was forced to brake and slow the 18-wheeler down considerably. As the two vehicles then proceeded down a hill toward the straight stretch of highway where the accident occurred, Jackson was able to regain speed and position his vehicle to attempt to pass. The Gryder and Jackson versions of the prior events when Gryder first entered Highway 34 a distance before the accident scene and the consistent view of the description of accident as summarized by Trooper Lewis' statement quoted above do not allow for the scene described by Wages with all *250 three vehicles approaching the convenience store at 70 mph.
Despite the trial court's error regarding Jackson's speed, the evidence does support a finding of negligence on Jackson's part for his failure to keep a proper look out for the early indications of Gryder's turn. Gryder and Wages testified that at some point, at least by the time the 18-wheeler was fully in the passing lane, the left turn blinker began operating. While the trial court noted the opinion of the defendants' accident reconstruction expert that the turn signal on the small Gryder pickup lay beneath the large cab of Jackson's vehicle in a blind spot, the court also concluded that the slowing of Gryder's vehicle as the passing maneuver was occurring gave further notice of a possible left-hand turn by Gryder into the approaching convenience store. Accordingly, the evidence supports the trial court's assessment of negligence on the part of Jackson, and we refuse to accept the defendants' assertion of error in this regard.
The Louisiana Supreme Court in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985) set forth guidelines to assist the courts in determining the degree of negligence assessable to joint tortfeasors. In assessing the nature of the conduct of the parties various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Id. p. 972. Additionally, the court should consider the extent of the causal relation between the conduct and the damages. Id.
It appears to us that the inattentive actions of both drivers equally created a great risk, although Gryder's conduct, in our judgment, was the more significant causal action for the accident. The conclusion reached by the trial court that Gryder simply did not look for vehicles behind her as she commenced her turning motion is most significant. If Gryder had looked, the large 18-wheeler bearing down upon her in the passing lane would have no doubt been avoided. It is significant also that the evidence indicates to us that Jackson's initial movement into the passing lane was a reasonable and proper maneuver to pass a vehicle traveling no more than 50 mph. Though his negligence thereafter occurred when he failed to timely recognize the possibility of Gryder's turn and to take greater evasive action, his maneuverability in the large vehicle to avoid the accident was much less than Gryder's had she merely looked in her rearview mirror.
Like the assessment of general damages, fault allocation is a factual determination, and the trier of fact, unlike the appellate court, has the benefit of viewing firsthand the witnesses and evidence. Clement v. Frey, 95-1119, 95-1163 (La.01/16/96), 666 So.2d 607. An appellate court may reallocate fault only after it has found an abuse of discretion and then only to the extent of lowering or raising the percentage of fault to the highest or lowest point reasonably within the trial court's discretion. Hill v. Morehouse Parish Police Jury, 95-1100 (La.01/16/96), 666 So.2d 612; Clement, supra. Since we find that Jackson's speed was not a factor and his liability can be no greater than 50%, we therefore amend the trial court's finding of comparative fault and assess each party with 50% of the fault in this accident.
For the above and foregoing reasons, we amend the judgment of the trial court as expressed herein. Costs of this appeal are assessed equally to the parties.
AMENDED AND, AS AMENDED, AFFIRMED.

*251 APPLICATION FOR REHEARING
Before BROWN, STEWART, GASKINS, CARAWAY, and DREW, JJ.
Rehearing Denied.
BROWN, J., would grant rehearing.
NOTES
[1] Jackson was an employee of Diamond Enterprises and insured by Canal Indemnity Insurance Company who are also defendants/appellants herein.