821 So.2d 647 (2002)
Diane PERKINS, Plaintiff-Appellant
v.
ALLSTATE INDEMNITY INSURANCE COMPANY, James W. Benton and Bennie Copeland, Defendants-Appellees.
No. 36,044-CA.
Court of Appeal of Louisiana, Second Circuit.
June 12, 2002.
*648 George W. Britton, III, Monroe, for Appellant.
Hudson, Potts & Bernstein, by Charles W. Herold, III, and Mark J. Neal, Monroe, for Appellees.
Before BROWN, CARAWAY and PEATROSS, JJ.
BROWN, J.,
Plaintiff, Diane Perkins, appeals a judgment finding her solely at fault for a traffic accident that occurred on Tower Drive in Monroe, Louisiana, on August 31, 1998. Concluding that the trial court was clearly wrong in determining that plaintiff was 100% at fault, we reverse, allocate fault between the parties and render judgment.

Facts
Tower Drive is a two-lane, two-way street which was undergoing extensive construction at the time of the accident. Ms. Perkins was driving west on Tower Drive in her 1997 Honda CRV when she decided to make a left-hand turn into the parking lot of the Support Enforcement Office. As she waited to make her turn, she dialed her sister's number on her cellular phone. While the phone was ringing, the oncoming traffic cleared; however, Ms. Perkins did not immediately turn. James W. Benton, who was driving a vehicle owned by Bennie Copeland[1] and insured by Allstate Indemnity Insurance Company, pulled behind Ms. Perkins. According to Mr. Benton, he waited approximately eight to ten seconds. When Ms. Perkins did not move, he started to pass her in the eastbound lane. Mr. Benton did not sound his horn to warn Ms. Perkins of his presence or intent to pass. As Mr. Benton began to pass Ms. Perkins, she started to turn and struck the right front side of Mr. Benton's vehicle. The collision caused Mr. Benton to veer to the left and hit another car parked on the roadside.
At trial, a dispute arose over whether Ms. Perkins had signaled a turn. Mr. Benton testified that her turn signal was not on. Ms. Perkins testified that the signal was on and that she checked her rear view mirrors before turning, but that she saw no one behind her. Her testimony regarding the turn signal was corroborated by Diane Cobb, an employee of Support Enforcement, who stated that as she walked out of the building and entered her van to run an errand, she saw in her mirror Ms. Perkins' vehicle stopped on the street with its turn signal operating. While sitting in her van in the parking lot, Ms. Cobb waited approximately a minute for Ms. Perkins to make the turn. Although Ms. Cobb said that she did not actually see the accident, she stated that she heard the sound of a car approaching from behind Ms. Perkins, and that "he hit the back of her car." Ms. Cobb then used an alternative exit to get out of the parking lot. When she returned she spoke to police at the scene.
*649 Ms. Perkins suffered minor injuries in the accident. She was taken to St. Francis Medical Center in Monroe where she was examined and diagnosed with contusions and muscle strains. Ms. Perkins obtained medical treatment for headaches and back pain and also claimed to have developed TMJ dysfunction.
The trial court found that it was immaterial whether Ms. Perkins had her turn signal on as she was the sole cause of the accident in that she breached her duty to ensure that the turn could be made without endangering a passing vehicle, citing Kilpatrick v. Alliance Casualty and Reinsurance Co., 95-17 (La.App. 3rd Cir.07/05/95), 663 So.2d 62, writ denied, 95-2018 (La.11/17/95), 664 So.2d 406.

Discussion
If a trial court's findings of fact are reasonable, a reviewing court may not reverse such findings even if it is convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Housley v. Cerise, 579 So.2d 973 (La. 1991); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In Stobart v. State Through DOTD, 617 So.2d 880 (La.1993), the Louisiana Supreme Court established a two-tier test for reversal on appellate review:
(1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120 (La.1987).
The duties imposed upon a left-turning motorist are found in La.R.S. 32:104. Under this statute, Ms Perkins was required to signal her intent to make a left turn at least 100 feet before reaching the Support Enforcement Office driveway. In addition, the left-turning driver must look to her rear to see if the left-hand lane is clear before beginning the left turn. Gryder v. Jackson, 32,037 (La.App.2d Cir.06/16/99), 739 So.2d 246, writ denied, 99-2576 (La.11/24/99), 750 So.2d 986; Bamburg v. Nelson, 313 So.2d 872 (La.App. 2d Cir. 1975), writ denied, 318 So.2d 57 (La.1975).
The law also imposes a duty upon the passing motorist. This duty is specifically set forth in La.R.S. 32:73 and 32:75. Based on these statutes, the jurisprudence holds that the driver of a following or overtaking vehicle must be alert to the actions of motorists preceding him on the highway. Duncan v. Safeway Insurance Company of Louisiana, 35,240 (La.App.2d Cir.10/31/01) 799 So.2d 1161; Burns v. Evans Cooperage Co., 208 La. 406, 23 So.2d 165 (1945). More particularly, the driver of an overtaking or passing vehicle has the duty to ascertain before attempting to pass a preceding vehicle that, from all the circumstances, the passing can be safely completed. Palmieri v. Frierson, 288 So.2d 620 (La.1974); Duncan, supra.
In Duncan, supra, this court concluded that a passing driver was 100% at fault for a collision with a left-turning vehicle. In Duncan, whether the turning driver was operating his turn signal was disputed, however, the passing driver knew from the circumstances that the preceding vehicle intended to turn into the adjacent driveway. The passing driver, who was impatient and agitated, waited approximately one minute before pulling around the vehicle. The court noted that although a passing motorist is not automatically required to give an audible warning with his horn, he should do so when the circumstances indicate that the other driver may intend to turn. La.R.S. 32:351(A); Duncan, supra at 1164.
*650 On the other hand, in Gryder, supra, this court amended the judgment of the trial court by increasing the fault of a left-turning motorist from 10% to 50% where the left-turning motorist failed to use her rear view mirror to see a passing 18-wheeler before attempting to turn. The court found that both drivers were equally inattentive to the circumstances that created the risks.
In this instance, it is apparent that Ms. Perkins was inattentive to the circumstances before she attempted to turn. She admitted during her testimony that she was dialing a telephone number on her cellular phone while waiting for one, possibly two, oncoming cars to pass. She insisted that her left-turn signal was operating. Her contention that she checked the rear view mirrors and observed no cars before proceeding to turn is contrary to the evidence. The trial court's finding that plaintiff was negligent is reasonable. Her actions clearly constituted fault that contributed to this accident.
Ms. Cobb testified, "I thought she [Ms. Perkins] was sitting in the road with her blinker on to turn in to the ... to that place, and I was waiting for her to pull in." When pressed as to whether she "clearly saw her blinkers on," she stated:
As far as I can recall. I remember thinking she was going to turn in, so I was going to wait and see which way she was going to go before I pulled out of my parking spot.
Okay. What happened next?
Well, I heard ... I looked in my rearview mirror and I saw her sitting there, waiting to turn, and then I heard ... And then I had started my car because it ... you know, it was hot and I started my car, but I was waiting. And then I heard a sound of a car approaching from behind her. And then he ... he hit the back of her car.
Ms. Cobb later reiterated her erroneous belief that the accident was a rear-end collision.
The trial court stated that whether Ms. Perkins was operating her turn signal was not important. We cannot agree with the trial court's view that it was immaterial whether Ms. Perkins had engaged her turn signal. The question of whether Ms. Perkins was operating her turn signal is partially determinative of whether Mr. Benton acted reasonably under the circumstances. If the signal was flashing, then Mr. Benton would have been put on notice that Ms. Perkins intended to turn, and, accordingly, it would cast doubt on whether he could safely pass.
Other circumstances also indicate that Mr. Benton did not exercise reasonable care. At the time of the accident, Tower Road was undergoing extensive construction on both sides of the street. There was gravel on the road and several orange caution signs indicating men working. There was no divider line visible on the road. Ms. Perkins' vehicle was stopped on the street adjacent to a driveway. A prudent driver observing the proximity of Ms. Perkins' stopped automobile to the drive-way should have expected a left-turning motorist. See Duncan, supra. Mr. Benton pulled up behind Ms. Perkins and waited for only eight to ten seconds before attempting to pass without warning. Under these circumstances, we conclude that Mr. Benton did not act reasonably or prudently. Either he should have been more patient in assessing the situation before attempting to pass or he should have sounded his horn in order to signal Ms. Perkins of his intention to pass. See Duncan, supra. We conclude that Mr. Benton's actions also constitute fault that contributed to this accident. The trial court *651 was clearly wrong in finding otherwise.[2]
The conclusion reached by the trial court that Ms. Perkins was preoccupied with her cell phone and was not concentrating on her driving is well-supported by the record. However, other factors such as the condition of the roadway and the circumstance of Ms. Perkins being stopped adjacent to a driveway leads to the conclusion that had Mr. Benton been more cautious and less impatient this accident probably would not have occurred. It is significant that Mr. Benton did not observe Ms. Perkins talking on the cell phone and did not determine whether her vehicle was parked, or stalled due to car trouble, or whether she was attempting to make a turn. He pulled up behind her, and when she did not move after a few seconds, he decided to pass her without warning. We allocate fault equally between the parties.[3]

Damages

Special DamagesMedical Expenses
Ms. Perkins suffered minor injuries as a result of striking the left side of her head in the accident. She was taken to St. Francis Medical Center in Monroe where she was examined and diagnosed with contusions and strains. She sought further medical treatment for headaches and back pain and also claimed to have developed TMJ dysfunction. Ms. Perkins visited Dr. Thomas Dansby on September 23, 1998, whose diagnosis was "post motor vehicle accident with a cervical and lumbar strain." Dr. Dansby recommended further physical therapy which Ms. Perkins continued to receive until November 5, 1998. Dr. Dansby released Ms. Perkins on November 6, 1998, noting that Ms. Perkins' neck and back were not bothering her anymore. He also noted that Ms. Perkins felt that her occasional headaches were related to her TMJ dysfunction. Ms. Perkins incurred medical bills of $2,230 as a result of the above treatment.
Ms. Perkins also alleged that the accident caused TMJ dysfunction. She testified that saw a dentist named Dr. Bagwell, but there is no other evidence regarding such treatment. The deposition of Dr. Ricky Caples, an expert in orthodontics, was submitted into the record. Ms. Perkins visited Dr. Caples on one occasion complaining of headaches and popping in her jaw. Dr. Caples said that Ms. Perkins had a Class II/Division II malocclusion, which is simply a term referring to imperfect contact of the teeth resulting from the way in which her teeth grew and formed during childhood and adolescence. Dr. Caples could *652 not state with certainty whether Ms. Perkins' TMJ dysfunction was due to an automobile accident or malocclusion, although he indicated that if the condition only presented itself after an accident, then one could conclude that the accident might have been the cause. He testified that he recommended a treatment plan that costs $4,430. Ms. Perkins never visited Dr. Caples again. In light of the scant evidence that the accident caused Ms. Perkins' TMJ dysfunction, we find that these damages were not proven.
Ms. Perkins also testified that she received a bill for $370.78 from the Metro Ambulance Service and a $60 emergency room bill from St. Francis Medical Center in Monroe.
Accordingly, we find that Ms. Perkins proved medical expenses in the amount of $2,660.78.

General Damages
Ms. Perkins testified about headaches and back problems caused by the accident. Most of these problems apparently resolved themselves after two months of treatment. Accordingly, we find that Ms. Perkins is entitled to $6,000 in general damages for the pain, suffering and inconvenience caused by this accident.

Conclusion
For these reasons, the judgment of the trial court dismissing plaintiff's claim against defendants, James W. Benton and Allstate Indemnity Insurance Company, and finding plaintiff, Diane Perkins, 100% at fault and assessing all costs to her is reversed and set aside. We render judgment as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is granted in favor of plaintiff, Diane Perkins, and against defendants, James W. Benton and Allstate Indemnity Insurance Company. Damages are awarded as follows:

General damages: $3,000.00 ($6,000 reduced by 50% fault of Plaintiff)
Medical expenses: $1,330.39 ($2,660.78 reduced by 50% fault of plaintiff)
 _________
Total award: $4,330.39[4]
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the costs of trial and appeal are assessed equally between the parties.
REVERSED AND RENDERED.
NOTES
[1] Prior to trial, Bennie Copeland was dismissed by joint motion of the parties.
[2] The Louisiana Supreme Court in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), set forth guidelines to assist courts in determining the degree of negligence assessable to joint tortfeasors. In comparing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actors, whether superior or inferior; and (5) any extenuating circumstances which might require the actors to proceed in haste, without proper thought. Additionally, the court should consider the extent of the causal relation between the conduct and the damages. Id.
[3] Fault allocation is a factual determination, and the trier of fact, unlike the appellate court, has the benefit of viewing firsthand the witnesses and evidence. Clement v. Frey, 95-1119, 95-1163 (La.01/16/96), 666 So.2d 607. An appellate court may reallocate fault only after it has found an abuse of discretion and then only to the extent of lowering or raising the percentage of fault to the highest or lowest point reasonably within the trial court's discretion. Hill v. Morehouse Parish Police Jury, 95-1100 (La.01/16/96), 666 So.2d 612.
[4] This award is also to include legal interest thereon from the date of judicial demand.