STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-1149

MARILYN MARICLE, ET AL.

VERSUS

LIBERTY MUTUAL INSURANCE CO., ET AL.

************

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT,
PARISH OF ALLEN, NO. C-2000-599,
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and J. David Painter, Judges.

AFFIRMED.

Cooks, J., dissents and assigns written reasons.

J. Craig Jones
Craig R. Hill
Jones & Hill, LLC
P. O. Box 1260
Oberlin, LA 70655
(337) 639-2127
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Marilyn Maricle
    Audrey McDaniel

Eric J. Miller
Bolen, Parker & Brenner, LTD.
P. O. Box 11590
Alexandria, LA 71315-1590
(318) 445-8236
COUNSEL FOR DEFENDANTS/APPELLEES:
    Donald Gene Dyer

**Transswood Trucking Company**
**Liberty Mutual Insurance Company**

PETERS, J.

This personal injury lawsuit arises from a two-vehicle accident which occurred in Allen Parish, Louisiana, at approximately noon on November 15, 1999. In the accident, Marilyn Maricle and her mother, Audrey McDaniel, sustained personal injuries. Ms. Maricle and Ms. McDaniel instituted suit to recover for their injuries, naming as defendants Donald Gene Dyer, the driver of one of the vehicles involved in the accident; Transwood Trucking Company (Transwood Trucking), Mr. Dyer's employer and the owner of the vehicle he was driving at the time of the accident; and Liberty Mutual Insurance Company (Liberty Mutual), the liability insurer of Transwood Trucking and Mr. Dyer. A jury trial resulted in a verdict in which the jury found that Mr. Dyer was without fault in causing the accident. Based on the jury's verdict, the trial court executed a judgment dismissing the plaintiffs' claims against all of the defendants. The plaintiffs appealed this judgment, asserting four assignments of error. For the following reasons, while we find merit in three of the plaintiffs' assignments of error and those findings mandate that we conduct a de novo review, we nevertheless reach the same conclusion as did the jury. Therefore, we affirm the trial court judgment.

## DISCUSSION OF THE RECORD

The accident giving rise to this litigation occurred on U.S. Highway 165 (Hwy 165) a short distance north of Oakdale, Louisiana. At the place where the accident occurred, Hwy 165 is a straight and level two-lane highway running north and south. The travel lanes are each twelve feet wide, and the paved shoulders on each side of the highway are approximately nine feet wide. The centerline is dashed yellow line indicating that it is not a no passing zone.

Immediately before the accident, Ms. Maricle was driving north on Hwy 165 in a 1983 Dodge sedan, which was also occupied by Ms. McDaniel and Ms. Maricle's three small children. At the same time, Mr. Dyer was driving Transwood Trucking's tractor-trailer rig (eighteen-wheeler) north on Hwy 165 and was immediately behind two vehicles, with the lead vehicle of the two being Ms. Maricle's vehicle.

There is little dispute concerning certain aspects of the accident. The testimony of the witnesses and the exhibits in evidence establish that the impact between the two vehicles occurred as Mr. Dyer attempted to pass Ms. Maricle's vehicle at a time when Ms. Maricle was attempting to make a left turn from Hwy 165 onto Meyers Road. Ms. Maricle's vehicle was struck between the driver's door and the front bumper by the right outside tire of the front axle of the rear tandem of the eighteen-wheeler. The point of impact between the two vehicles was one to two feet across the centerline of Hwy 165 in the southbound lane. The photographs in evidence clearly show the scraping effect on the trailer tire and black marks on the fender of the Dodge. Additionally, photographs and eyewitness testimony place debris from Ms. Maricle's vehicle west of the centerline of the highway. The impact of the collision deflated the Dodge's left front tire, and the vehicle came to rest approximately thirteen feet from the point of impact, facing in a northwesterly direction entirely within the southbound lane of Hwy 165. Mr. Dyer parked his eighteen-wheeler on the shoulder of the northbound lane of Hwy 165 beyond the accident scene.

The principal facts in dispute involve the movement of the two vehicles at the moment of the collision. Ms. Maricle, Ms. McDaniel, and Mr. Dyer gave direct testimony regarding the particulars of the accident, as did two independent eyewitnesses to the accident, Allen Parish Deputy Sheriff Patrick Buxton and Betty

2

Chevalier. Louisiana State Police Trooper Clifton Mire, who investigated the accident, also testified, as did two accident reconstruction experts.

Ms. Maricle testified that as she traveled north on Hwy 165, she decided to turn left onto Meyers Road to visit a friend. According to Ms. Maricle, she activated her turn signal approximately 100 yards from the Meyers Road intersection and reduced her speed to five to ten miles an hour to begin her turn. She testified that when she began the turn, she looked in her rearview mirror and saw Mr. Dyer's eighteen-wheeler coming around her vehicle. When she observed him, she immediately stopped to avoid hitting him. According to Ms. Maricle, the eighteen-wheeler was partly on the west shoulder as it passed, but as it began to return to the northbound lane of Hwy 165, it "cut back over too quick," resulting in the impact. She believed that her vehicle spun a full 360 degrees before it came to a stop.

The testimony of Ms. McDaniel, who occupied the front seat of the Dodge at the time of the accident, was of little assistance in determining the dynamics of the accident. She remembered only that her daughter hit her brakes, and, as she looked through the window, the eighteen-wheeler was immediately in front of her. Unlike her daughter, she did not believe their vehicle spun after impact.

Mr. Dyer testified that he had just left Oakdale traveling north on Hwy 165 and was traveling approximately forty-five miles per hour when he observed two slow-moving vehicles ahead of him. As he approached the two vehicles, he observed no brake lights or turn signals, and, after making sure Hwy 165 was clear of southbound traffic, he increased his speed to fifty or fifty-five miles per hour and proceeded to pass both vehicles. According to Mr. Dyer, he was almost completely around the lead vehicle when he "felt something." He then looked in his rearview mirror and saw that

3

Ms. Maricle's vehicle had "bounced off" of his trailer and seemed to fall in line behind his eighteen-wheeler. He then reentered the northbound lane and came to a stop on the shoulder. According to Mr. Dyer, at no time during the passing maneuver did his eighteen-wheeler traverse any part of the west shoulder of Hwy 165.

Immediately before the accident, Ms. Chevalier was driving her Chevrolet Corsica north on Hwy 165 and was between the two vehicles involved in the accident. According to Ms. Chevalier, when she left Oakdale, there was no vehicle in front of her on Hwy 165. However, while traveling at fifty-five miles per hour, she soon reached Ms. Maricle's vehicle. When asked to describe her observations concerning the accident, Ms. Chevalier stated the following:

> Well, I saw [Ms. Maricle's] blinker light finally. I hadn't seen it so I had to stop pretty abruptly but she was going to make a left hand turn and just before I got caught up to her I could see the truck in my rearview mirror and it sure did look like it was coming awful fast. And I said, "Oh Lord, here I am in the middle". Well, I stopped. I had to stop pretty quick and I looked in my side of my mirror and here this truck's coming out of the left hand side of us. I was so scared, I couldn't let the woman know not to turn or anything and the truck, the trailer part of it got right up to about halfway and she turned into it. I'm sure she didn't see him coming.

Ms. Chevalier disagreed with Ms. Maricle's statement that the eighteen-wheeler traversed the west shoulder of Hwy 165 during the passing maneuver. She stated that when it passed her, the eighteen-wheeler was so close to her vehicle that "[Mr. Dyer] could have reached out and grabbed a hold of us."

Deputy Buxton testified that he was traveling south on Hwy 165 and was at least 200 to 250 yards north of the intersection of Hwy 165 and Meyers Road when the accident occurred. According to Deputy Buxton, Mr. Dyer's eighteen-wheeler had ample time to pass the two vehicles, as the southbound lane was clear all the way to his sheriff's unit. The deputy testified that he observed Ms. Maricle begin her left

4

turn maneuver at that same time that Mr. Dyer began to pass and that both vehicles crossed the centerline of Hwy 165 simultaneously. It appeared to Deputy Buxton that Ms. Maricle stopped her vehicle one to two feet west of the highway centerline as Mr. Dyer "aggressively" passed with one-half of his vehicle in the southbound lane and one-half on the west shoulder. Deputy Buxton testified that, at the time of impact, Mr. Dyer's trailer was still partially on the west shoulder as he began to return to the northbound lane. Once the impact occurred, Deputy Buxton did not see Ms. Maricle's vehicle again until the eighteen-wheeler had cleared the southbound lane and she had come to a complete stop. Therefore, he could not say whether the impact caused her vehicle to spin, although he testified that he thought it had. Deputy Buxton also testified that he did not observe a left turn signal on Ms. Maricle's vehicle, but he stated that he was never close enough to the Maricle vehicle to see a blinker. The deputy acknowledged that Mr. Dyer had adequate time to pass both vehicles safely, that it is not illegal to pass aggressively, and that he did not consider Mr. Dyer's actions to be reckless. Had he been the investigating officer, he would not have issued a citation to either party.

Trooper Mire arrived on the scene over one hour after the accident. He interviewed Mr. Dyer at the scene and Ms. Maricle in an Oakdale hospital. According to Trooper Mire, Ms. Maricle told him that she was attempting to turn onto Meyers Road and that she did not see the eighteen-wheeler, while Mr. Dyer told him that as he passed two slow-moving vehicles, Ms. Maricle turned into his path. Trooper Mire examined the accident scene and concluded that the impact occurred inside the southbound lane and that Ms. Maricle's vehicle traveled thirteen feet after

5

impact. After completing his investigation, he issued a traffic citation to Ms. Maricle, charging her with making an unsafe turn in violation of La.R.S. 32:104.

Ms. Maricle recalled someone interviewing her at the hospital, but did not recall everything she and the interviewer discussed. She denied that she told anyone she never saw the eighteen-wheeler. She did remember that she was issued a traffic citation, and she later paid the fee associated with the citation. According to Ms. Maricle, she made the payment because an attorney told her that if she did so, it would not appear on her driving record and she would not have to appear in court.

Verrel Paul Herbert, a resident of Quincy, California, who described his occupation as that of "commercial vehicle safety and compliance specialist," testified on behalf of the plaintiffs and was recognized by the trial court, first as an expert in the field of trucking safety, and later in his testimony as an expert in the field of accident reconstruction. Mr. Herbert opined that Mr. Dyer did not properly manage the speed of his eighteen-wheeler in the passing maneuver in that he should have slowed down and communicated his presence before passing. He opined that the impact occurred when Mr. Dyer tried to return to the northbound lane too soon and that this negligence was the cause of the accident. In reaching this conclusion, Mr. Herbert assumed as true that the brake lights on the Maricle and Chevalier vehicles were engaged and visible to Mr. Dyer, that Ms. Maricle's vehicle was stationary at the time of impact, and that the Maricle vehicle was struck by the rear wheels of the trailer as the eighteen-wheeler moved back into the northbound lane of Hwy 165. According to Mr. Herbert, the rear wheel impact occurred because when an eighteen-wheeler attempts to return to its original lane after a passing maneuver, the trailer will not follow in the exact path of the tractor but will cheat, or off-track to the inside.

6

However, by accepting as fact these relative positions of the tractor and trailer at the time of impact, Mr. Herbert conceded that it would have been impossible for Deputy Buxton to have seen the impact, as the tractor would have obstructed his view.

Mr. Herbert attempted to explain why Ms. Maricle's vehicle traveled thirteen feet forward after impact, even though it was stopped at impact, by theorizing that the tire rims of both vehicles engaged, temporarily causing the truck to pull the car into motion. He acknowledged that the more reasonable explanation of her forward movement after impact is that she was moving at impact. Had she been stopped, and assuming no engagement by the tire rims, he would have expected the vehicle to come to rest in a northeasterly direction instead of a northwesterly direction. Mr. Herbert also disagreed with both Ms. Maricle and Deputy Buxton in that he did not believe the accident would have occurred at the established point of impact had any portion of the trailer been on the west shoulder of Hwy 165 at the time of impact. He attached no importance to whether or not on its way to its resting place the car spun in a complete circle.

Gene Byron Moody, a Baton Rouge, Louisiana consulting engineer, was recognized by the trial court as an expert in the field of accident reconstruction and testified on behalf of the defendants. Mr. Moody's evaluation of the evidence, including the scrub marks caused by the car's deflated tire on the pavement, caused him to conclude that Ms. Maricle's vehicle was actually in motion at the time of impact and was moving toward the northwest at a slight angle as it began its turn onto Meyers Road. According to Mr. Moody, the vehicle's momentum carried it in that direction and Ms. Maricle could not have stopped it prior to impact. In fact,

7

according to Mr. Moody, the forward momentum was necessary for the vehicle to have reached its final resting place after impact.

Both experts agreed that the point of impact was inside the southbound lane of Hwy 165. Thus, based on the evidence presented, and particularly the experts' opinions, it is clear that the single most important disputed fact in this matter is whether or not the Maricle vehicle was in motion at the time of impact. If the vehicle was not in motion at the time of impact, the argument that Mr. Dyer attempted to return to the northbound lane too soon has credibility, establishing fault on his part. If the Maricle vehicle was in motion at the time of impact, credence can be given to the argument that Ms. Maricle either did not stop at all or, after stopping, did not see the truck and simply drove into the trailer's passing rear wheels, establishing fault on her part. Mr. Moody concluded that Ms. Maricle was moving, and Mr. Herbert concluded otherwise. The two versions of the accident are irreconcilably at odds with each other.

After hearing the evidence presented and after being instructed as to the applicable law, the jury was given a verdict form with five interrogatories to answer, with the first three being related to the issue of liability and with the remaining two being related to the issue of quantum. The first interrogatory related to the question of Mr. Dyer's fault, and the jury concluded that Mr. Dyer was without fault in causing the accident. That conclusion rendered the remaining interrogatories moot.

**OPINION**

All four of the plaintiffs' assignments of error relate to evidentiary rulings by the trial court. The first three pertain to rulings admitting evidence unfavorable to

8

Ms. Maricle, and the fourth pertains to a ruling excluding evidence arguably favorable to her.

### *Assignment of Error Number One*

In their first assignment of error, the plaintiffs assert that the trial court erred in admitting evidence that Ms. Maricle was issued a traffic citation following the accident and that she paid it, where there was no evidence that she entered a guilty plea to the traffic offense. We find that this assignment of error has merit.

A guilty plea to a traffic offense is admissible into evidence as an admission against interest relevant to show fault. *Shephard ex rel. Shephard v. Scheeler*, 96-1690, 96-1720 (La. 10/21/97), 701 So.2d 1308. It is competent evidence in a civil action involving the same subject matter. *Davis v. Bankston*, 192 So.2d 614 (La.App. 3 Cir. 1966). However, in a civil case it is inadmissible merely to show that one or the other of the parties was charged by the police with a traffic violation. *Ruthardt v. Tennant*, 215 So.2d 805 (La.1968). Additionally, it is inadmissible in a civil case to show that a party pleaded nolo contendere. La.Code Evid. art. 410.

Often, the payment of a traffic citation requires no court appearance. Pursuant to La.R.S. 32:641(A), the judges of the various judicial districts[1] are authorized to "adopt a parishwide schedule of fines, penalties and costs for violations of traffic laws . . . within the limits of such penalties as are set by law." Any individual charged with a violation of a traffic law included within the schedule "may enter a written plea of guilty to the [traffic violation] by signing a declaration to that effect" and pay the fine and costs provided on the schedule without having to appear in open court. La.R.S. 32:641(B) and (E).

---

[1]Other than the parish of Orleans, which is excepted from the statute.

At a hearing held three days before the beginning of trial, the trial court heard a number of evidentiary motions filed by both sides to the litigation. One was a motion filed by the plaintiffs seeking to exclude any reference to the fact that Trooper Mire had issued the traffic citation to Ms. Maricle for making an unsafe left turn or to the fact that she had paid the fine associated with the traffic citation. The trial court rejected this motion, and, at trial, Ms. Maricle was forced to admit on cross-examination that she received the traffic citation and paid a fine. The defendants then introduced a copy of the traffic citation, as well as a receipt issued by the sheriff's office, showing payment of the fine and costs. However, the defendants offered no evidence to establish that Ms. Maricle had executed a written plea of guilty as required by La.R.S. 32:641.

The defendants have provided us with no reference to authority for the proposition that the mere payment of a fine without a corresponding written guilty plea satisfies the requirement of La.R.S. 32:641. Our research reveals only one Louisiana case which even remotely suggests that payment of a fine amounts to a guilty plea, and even its language is ambiguous. Specifically, in *Jackson v. St. Pierre*, 336 So. 2d 261, 264 (La.App. 1 Cir. 1976), there is language to the effect that "both [defendants] entered guilty pleas by paying the fines prescribed therefor." The first circuit further explained that, while such a plea is admissible against a defendant in a civil proceeding, it is not conclusive, and the amount of weight to be given to such a plea must be determined by consideration of all the evidence, including the reason for the plea. In finding the defendants without fault, the first circuit gave weight to their explanation "[t]hat it would be less hassle and expense to pay the fine rather than go through with a trial on such a matter." *Id.*

10

To the extent that the *Jackson* decision *seems* to suggest that the payment of a fine by itself equates to a guilty plea, we disagree. One of our neighboring states, Arkansas, in *Dedman v. Porch*, 739 S.W.2d 685 (Ar.1987), has declined to hold that paying a traffic ticket is an admission against interest, and we choose to follow that rationale. Thus, we find that the trial court erred in allowing evidence of the traffic citation and payment of the fine to be introduced at trial.

### *Assignment of Error Number Two*

In their second assignment of error, the plaintiffs assert that the trial court erred in allowing Trooper Mire to give opinion testimony with regard to the cause of the accident. We also find merit in this assignment of error.

Trooper Mire was a rather inexperienced officer at the time of the accident. He had graduated from the Louisiana State Police Academy just six months earlier and was still in the supervisory or probationary period of his career. Although he testified that he was not an expert in accident reconstruction, the trial court allowed him, by reference to his accident report, to testify that Ms. Maricle was inattentive and distracted at the time of the accident and that had she not been so, she would have seen the eighteen-wheeler as it approached. The trial court based the admissibility of this opinion on the trooper's "experience as a police officer and his training."

With regard to the cause of the accident, Trooper Mire testified that he noted on his accident report that the "harmful event" in the accident was the movement of Ms. Maricle's vehicle. Additionally, Trooper Mire was allowed to testify, not that *he gave Ms. Maricle a traffic citation* for an unsafe left turn, but that she *committed* an unsafe left turn.

11

The testimony of an investigating officer not qualified as an accident reconstruction expert is limited to opinions based upon rational perceptions of facts and recollections pertaining to the accident scene. *Jaffarzad v. Jones Trucking, Inc.*, 561 So.2d 144 (La.App. 3 Cir.), *writ denied*, 565 So.2d 450 (La.1990). It is prejudicial error to allow a non-expert investigating officer to give opinions on crucial fact determinations concerning liability when the officer did not witness the accident. *Fontenot v. Cooper*, 599 So.2d 883 (La.App. 3 Cir.), *writ denied*, 604 So.2d 1305 (La.1992). We find that the trial court erred in allowing Trooper Mire to give testimony in opinion form.

### *Assignment of Error Number Three*

At the previously mentioned hearing on the evidentiary motions, the trial court also rejected the plaintiffs' motion to exclude Trooper Mire's accident report from being introduced into evidence. At trial, the trial court allowed the accident report to be admitted into evidence pursuant to La.Code Evid. art. 803(5), but declined to allow it to be published to the jury because certain portions contained "inadmissible hearsay." While the trial court did not allow the jury to examine the report, it did allow Trooper Mier to be questioned extensively concerning the contents of the report, and it did allow him to read directly from it. In their third assignment of error, the plaintiffs assert that this was error on the part of the trial court. We agree.

The contents of Trooper Mire's accident report clearly contain hearsay as defined by La.Code Evid. art. 801(C). The report is therefore inadmissible unless it fits within one of the exceptions found in La.Code Evid. art. 803. While public records and reports are generally considered as an exception to the hearsay

12

exclusionary rule pursuant to La.Code Evid. art. 803(8), that same provision specifically excludes "[i]nvestigative reports by police and other law enforcement personnel" from that exception. La.Code Evid. art. 803(8)(b)(i).

The trial court found that the accident report was admissible pursuant to the exception to the hearsay exclusionary rule found in La.Code Evid. art. 803(5), which provides:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence and received as an exhibit but may not itself be taken into the jury room. This exception is subject to the provisions of Article 612.

Louisiana Code of Evidence Article 612(A) relates to the use of writings to refresh the memory of a witness and provides in pertinent part:

> In a civil case, any writing, recording, or object may be used by a witness to refresh his memory while testifying. If a witness asserts that his memory is refreshed he must then testify from memory independent of the writing, recording, or object. If, before or during testimony, a witness has used a writing, recording, or object to refresh his memory for the purpose of testifying in court, an adverse party is entitled, subject to Paragraph C, to have the writing, recording, or object produced, if practicable, at the hearing, to inspect it, to examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

Louisiana Code of Evidence Article 612(C) provides:

> If it is claimed that a writing or recording contains matters not related to the subject matter of the testimony the court shall examine it in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal.

In the matter before us, Trooper Mire was asked whether he needed his report in order to testify, and he responded: "I'm gonna need the report to be accurate."

Significantly, he was never asked whether his review of the report refreshed his memory or whether he had insufficient recollection to testify and was relying solely on the content of the report. Because there is no evidence of insufficient recollection, the trial court erred in admitting the accident report and, at the same time, in allowing the trooper to testify concerning its contents, as if he had independent recollection. Additionally, as pointed out in *Talamo v. Shad*, 619 So.2d 699, 701-02 (La.App. 4 Cir.), *writ denied*, 625 So.2d 175 (La.1993), for a document to be admissible under La.Code Evid. art. 803(5), "it must be shown, among other things, that the witness had firsthand knowledge of the matter described in the memorandum." While Trooper Mire had firsthand knowledge of matters he observed in his investigation, his conclusions with regard to the accident itself were acquired from his investigative analysis, and not from firsthand knowledge. Therefore, the trial court erred in allowing introduction of the accident report and in allowing Trooper Mire to read from that report.

### *Assignment of Error Number Four*

In this final assignment of error, the plaintiffs assert that the trial court erred in excluding evidence of Mr. Dyer's violation of Transwood Trucking's safety rules by failing to sound his horn as he began his passing maneuver. The ruling rejecting this evidence was again rendered by the trial court at the hearing held three days before trial. We reject this assignment of error.

The safety rule at issue is Transwood Trucking Safety Rule No. S-2, which requires in pertinent part that a Transwood Trucking driver sound his horn when passing a vehicle from the rear. As pointed out by the defendants in brief, the only violations pled by the plaintiffs were the laws of the State of Louisiana and of the

Parish of Allen. The trial court did not err in granting the motion to exclude this evidence.

### *Standard of Review*

Ordinarily, we review a jury's factual findings under the manifest error standard of review. *See Rosell v. ESCO*, 549 So.2d 840 (La.1989). However, "[w]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence." *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252, p. 7 (La. 2/20/95), 650 So.2d 742, 747.

Ms. Maricle and Ms. McDaniel urge this court to conduct a de novo review based on the various trial court errors alleged. On the other hand, the defendants argue that this is nothing more than a manifest error case. However, in making this argument, the defendants have not directly responded to the plaintiffs' assignments of error. Rather, their response begins and ends with the contention that any errors as to the admissibility of evidence addressing Ms. Maricle's negligence should not be considered on appeal because the only decision the jury reached was that Mr. Dyer was not negligent. The defendants accordingly maintain that because the jury never made a finding regarding Ms. Maricle's negligence, the verdict could not be tainted by error.

Initially, we acknowledge that the supreme court, in *Picou v. Ferrara*, 483 So.2d 915 (La.1986), held that when the trial court's legal error taints only one of several findings of fact by the jury, the reviewing court may give the usual deference to the untainted findings and make de novo determinations without regard to the

15

findings of the jury as to the tainted issues. This circuit applied that holding in *Nalle v. State Farm Fire & Cas. Co.*, 97-441 (La.App. 3 Cir. 10/8/97), 702 So.2d 854, 860 n.4, *writ denied*, 97-2832 (La. 2/13/98), 706 So.2d 994. However, we do not find that the holding in *Picou* is applicable to the circumstances of the present case.

Specifically, the issue of the negligence of Ms. Maricle and Mr. Dyer was such that a finding of no fault on the part of Mr. Dyer was tantamount, under the facts of this case, to an implicit finding of fault on the part of Ms. Maricle. By admitting the evidence that Ms. Maricle got a ticket and paid the fine, the trial court effectively encouraged the jury to consider that the trooper found Ms. Maricle at fault, which concomitantly tilted the scales in favor of a finding that Mr. Dyer was not at fault at all. In reaching this conclusion, we also recognize that Ms. Maricle was allowed at trial to explain why she paid the fine and costs. However, absent a valid written plea of guilty, she should not have been required to explain anything with regard to the traffic citation. That is to say, she is not required to explain or defend herself against inadmissible evidence.

The resulting prejudice was all the more pronounced because the evidence affected a material fact determinative of the cause of the accident, *i.e.*, whether the Maricle car was in motion when the collision took place or whether it was stopped. Further, allowing Trooper Mire to give an expert opinion on the issue of accident reconstruction and allowing his report to be admitted into evidence essentially clothed his unqualified conclusions as to Ms. Maricle's fault with an indicia of reliability and resulted in him answering the credibility question for the jury.

Thus, we find that the first three assignments of error have merit, and we find that the introduction of this inadmissible evidence resulted in legal errors that

16

interdicted the fact-finding process to the extent that a de novo review of the record is required. Accordingly, no weight should be accorded the judgment of the trial court which implements this jury verdict because it is simply not entitled to a presumption of regularity. *McLean v. Hunter*, 495 So.2d 1298 (La.1986).

### *De Novo Review*

In Louisiana tort cases, the plaintiff has the burden of proving every essential element of his case by a preponderance of the evidence. *Duncan v. Safeway Ins. Co. of La.*, 35,240, 35-241 (La.App. 2 Cir. 10/31/01), 799 So.2d 1161. Essential elements in the present case were that Mr. Dyer was negligent and that his negligence was a cause-in-fact of the accident. Both a passing maneuver and a left-turning maneuver are dangerous vehicular activities. *Craig v. Hebert*, 99-1222 (La.App. 3 Cir. 2/2/00), 758 So.2d 260. In this case, both drivers, Mr. Dyer who was passing and Ms. Maricle who was turning left, were required to exercise a high degree of care in executing their respective dangerous maneuvers. *See id.*

The duty imposed upon the passing motorist is specifically set forth in La.R.S. 32:73 and 32:75. Louisiana Revised Statutes 32:73(1) provides that "the driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance, and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle." Additionally, La.R.S. 32:75 provides:

> No vehicle shall be driven to the left side of the center of the highway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken. In every event the overtaking vehicle must return to the right-hand side of the roadway before coming

17

within one hundred feet of any vehicle approaching from the opposite direction.

"Based on these statutes, the jurisprudence holds that the driver of a following or overtaking vehicle must be alert to the actions of motorists preceding him on the highway." *Perkins v. Allstate Indem. Ins. Co.*, 36,044, p. 3 (La.App. 2 Cir. 6/12/02), 821 So.2d 647, 649. "More particularly, the driver of an overtaking or passing vehicle has the duty to ascertain before attempting to pass a preceding vehicle that from all the circumstances of traffic, lay of the land, and conditions of the roadway, the passing can be completed with safety." *Kilpatrick*, 663 So.2d at 66.

The duties imposed upon a left-turning motorist are found in La.R.S. 32:104. Under this statute, Ms. Maricle was required to signal her intent to make a left turn at least 100 feet before reaching Meyers Road. In addition, the left-turning driver must look to her rear to see if the left-hand lane is clear before beginning the left turn. *Kilpatrick v. Alliance Cas. & Reinsurance Co.*, 95-17 (La.App. 3 Cir. 7/5/95), 663 So.2d 62, *writ denied*, 95-2018 (La. 11/17/95), 664 So.2d 406.

Simply stated, when one considers both the uncontradicted and the contradicted evidence, the dynamics of the accident could have occurred in only one of two ways: either Mr. Dyer began a passing maneuver and cut back too sharply, striking Ms. Maricle's stationary vehicle, or Ms. Maricle drove into the side of Mr. Dyer's eighteen-wheeler as he passed her vehicle. Obviously, the plaintiffs argue that Mr. Dyer cut back too sharply, striking her stationary vehicle.

The testimony and physical evidence overwhelmingly establish that the accident at issue occurred entirely in the southbound lane of Hwy 165, and at a time when Mr. Dyer had almost completed his passing maneuver; that as Mr. Dyer approached the slow-moving Chevalier and Maricle vehicles, and even as he changed

18

lanes to begin his passing maneuver, he had an unobstructed view of a clear southbound lane; and that his return to the right side of the highway occurred long before Deputy Buxton's vehicle came within 100 feet of the eighteen-wheeler. Thus, the only requirement of La.R.S. 32:75 at issue with regard to Mr. Dyer's operation is whether the passing maneuver could be accomplished without interfering with the safe operation of Ms. Maricle's vehicle.

In contrast, the testimony and evidence does not overwhelmingly establish that Ms. Maricle timely signaled her intent to make a left turn. While she testified that she activated her left turn signal 100 yards before beginning her turn, Deputy Buxton never saw a signal, and Ms. Chevalier "finally" saw the signal and had to stop "abruptly." This suggests that the turn signal was engaged, not at 100 yards from the intersection, but very late, and probably after the eighteen-wheeler entered the passing lane.

Deputy Buxton's testimony does not assist the plaintiffs' case, although he does provide some evidence of improper driving by Mr. Dyer. Having viewed the accident from at least 200 yards, he suggested that the eighteen-wheeler aggressively passed the two vehicles while partly on the west paved shoulder of Hwy 165 and partly in the southbound lane, that the eighteen-wheeler and Ms. Maricle's vehicle crossed the centerline of Hwy 165 at exactly the same time, and that he actually saw the collision. As pointed out by both experts, it would have been impossible for the eighteen-wheeler to make contact with Ms. Maricle's vehicle at the point of impact if any part of the trailer was still on the west shoulder of the highway. Additionally, Ms. Maricle could not have crossed the centerline at the same time as Mr. Dyer and still observe the eighteen-wheeler in her rearview mirror. Furthermore, Mr. Herbert

19

testified that it was not possible for Deputy Buxton to have seen the collision if the eighteen-wheeler was attempting to return to the northbound lane at that point in time.

Ms. Maricle's own testimony conflicts with a finding of fault on the part of Mr. Dyer. Concerning her initial actions in effecting her turn, she stated: "I started my turn and I looked in my rearview mirror and I saw the eighteen wheeler coming around so I stopped so I wouldn't hit him." In other words, when she looked in her rearview mirror, the eighteen-wheeler had already begun to pass. For Ms. Maricle to have seen the eighteen-wheeler in her mirror, her vehicle would have had to have been parallel to the highway, and she would have had to have turned into the southbound lane after that observation.

Our evaluation of the preponderance of the evidence is that Ms. Maricle was solely responsible for this accident. The evidence in her favor is not reconcilable. Ms. Chevalier, the person with the best vantage point, testified that Ms. Maricle turned into the eighteen-wheeler. Additionally, Ms. Maricle's own expert admitted that, while he reached a different conclusion concerning the reason for the post-accident location of the Maricle vehicle, the more reasonable explanation of her forward movement after impact was that she was moving at impact. Given the record as a whole, the evidence preponderates that not only was Ms. Maricle's car in the wrong lane, but also it was in motion when the impact occurred.

In conclusion, the evidence preponderates that Ms. Maricle did not see the passing eighteen-wheeler and turned across the centerline of Hwy 165 and into the trailer. Thus, we assess all of the fault in causing this accident to Ms. Maricle.

20

**DISPOSITION**

For these reasons, we affirm the judgment of the trial court dismissing the claims of Marilyn Maricle and Audrey McDaniel against Donald Gene Dyer, Transwood Trucking Company, and Liberty Mutual Insurance Company. We assess all costs of this appeal to Marilyn Maricle and Audrey McDaniel.

**AFFIRMED.**

MARILYN MARICLE, ET AL.

VERSUS

LIBERTY MUTUAL INSURANCE CO., ET AL.

**COOKS, J. dissents.**

I respectfully dissent from the majority opinion finding Ms. Maricle solely at fault. I would have found the trucker, Donald Dyer, partly at fault in causing this accident. I agree with the majority opinion finding the verdict was tainted by the error of the trial court in allowing inadmissable and highly prejudicial evidence to be considered by the jury. Moreover, Trooper Mire, the officer who issued the traffic citation, did not arrive on the scene until about an hour after the accident and his testimony can offer nothing as to the cause of the accident.

Once the improper evidence is excluded, the remaining evidence consists of each party's accident reconstruction expert and the two independent witnesses, Deputy Buxton and Ms. Chevalier. The two accident reconstruction experts differ in their opinion as to the cause of the accident. There is sufficient evidence to support a finding Mr. Dyer was partly at fault. The independent witnesses to the accident, Deputy Buxton and Ms. Chevalier, both testified Mr. Dyer was traveling at an excessive rate of speed when he was attempting to pass not one, but two vehicles. Ms. Chevalier testified: "I could see the truck in my rearview mirror and it sure did look like it was coming awful fast. And I said, 'Oh Lord, here I am in the middle.'" Additionally, Ms. Chevalier corroborated Ms. Maricle's testimony that she activated her brake lights and turn signal. Deputy Buxton was traveling on the opposite lane coming toward Ms. Maricle and testified the trucker was passing "aggressively",

obviously unaware Ms. Maricle was stopped preparing to turn left. He testified both vehicles crossed the centerline at the same time. Deputy Buxton testified as follows:

> Q. At the point Ms. Maricle, right before she began her turn, before she began turning left had the eighteen wheeler come out to pass?
> A. No sir.
> Q. I'm sorry?
> A. No sir.
> Q. Who broke the centerline first?
> A. To me, both of them did
> Q. All right. So it's simultaneous?
> A. Yes sir.
> Q. And when they both broke the centerline what happened next?
> A. When both of them broke the centerline it appeared that Ms. Maricle, as she started turning to make her left turn to me she observed the eighteen wheeler coming at her and it appeared she had stopped and then the eighteen wheeler, when he came out he came out what I call aggressive. To pass he was half on the shoulder, half in the lane of travel.
> Q. Say that again, please?
> A. He was half on the shoulder and half on the lane of travel. The southbound lane.
> Q. All right.
> A. She must have observed him and he got by her but when he cut back in he (inaudible). The rear of the trailer hit the front of her car.
> . . . .
>
> Q. Did you feel from what you observed, in your view, that the maneuver that you saw Mr. Dyer engaged in was safe?
> A. No sir.

Of significance to the majority was whether Ms. Maricle's vehicle was moving at the time of the accident. The majority theorizes: "If the vehicle was not in motion at the time of impact, the argument that Mr. Dyer attempted to return to the northbound lane too soon has credibility, establishing fault on his part." However, the majority opinion ignores the testimony of Ms. Maricle's reconstruction expert that her vehicle was stopped at the time of impact and the testimony of Deputy Buxton, an eye witness to the accident. At trial Deputy Buxton was specifically questioned regarding that point:

> Q. At the point of impact was Ms. Maricle's vehicle moving from what you could observe?
> A. No sir. To me it appeared she had stopped.

The majority also ignores the testimony of Ms. Chevalier who was positioned directly behind Ms. Maricle's vehicle. Ms. Chevalier testified as follows:

> Well, I saw her blinker light finally. I hadn't seen it so I had to stop pretty abruptly but she was going to make a left hand turn and just before I got caught up to her I could see the truck in my rearview mirror and it sure did look like it was coming awful fast. And I said, "Oh Lord, here I am in the middle." Well, I stopped. I had to stop pretty quick and I looked in my side of my mirror and here this truck's coming out of the left hand side of us.

Ms. Chevalier's testimony provides an insight into what might have happened to cause the accident. Ms. Chevalier testified when she and Ms. Maricle were slowing down, the truck was still behind Ms. Chevalier. Instead of stopping behind Ms. Chevalier, Mr. Dyer attempted to execute a passing maneuver around the two stopped vehicles. Ms. Maricle checked her rearview mirror and saw only Ms. Chevalier's vehicle. As she began her turn she visualized the truck for the first time along side of her. She crossed the centerline and stopped. When Mr. Dyer attempted to complete his passing maneuver, his trailer collided with the front end of Ms. Maricle's vehicle. Moreover, I would find Mr. Dyer was negligent in attempting to pass two stopped vehicles at the intersection of Meyers Road and U.S. Hwy. 165. Louisiana Revised Statute 32:76 provides, in relevant part:

> A. No vehicle shall at any time be driven to the left side of the highway under the following conditions:
> (2) when approaching within one hundred feet of or traversing any intersection or railroad grade crossing.

Although the majority opinion notes the "centerline is a dashed yellow line indicating that it is not a no passing zone", I would find a passing motorist is held to a greater degree of care when attempting to pass at an intersection such as this one where it is reasonable to assume motorists would be turning left.

Despite evidence in the record supporting two credible versions of the accident which, the majority admits, "are irreconcilably at odds with each other", the majority opinion, in the guise of a *de novo* review, reconstructs the events and concludes Ms.

Maricle was solely at fault in causing the accident. I respectfully submit the only reasonable conclusion, based on the admissible evidence, is Ms. Maricle and Mr. Dyer were both at fault in some way in causing this accident. The Louisiana legislature in its wisdom enacted the comparative fault statute for situations such as this one. On the facts presented here, I would find both parties at fault in causing this accident.